**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ROBERT NASH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **No. 12 C 6225** |
| | ) |
| **CAROLYN W. COLVIN,[1]** | ) **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Nash seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion, denies the Commissioner's motion, and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on July 7, 2009, alleging that he became disabled on March 19, 2009 due to severe lumbar impairment, cervical disc disease, depression, difficulty sleeping, arthritis in his spine, and "post op problems with

---

[1]     Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

pain pump." (R. 165, 195). The Social Security Administration denied the applications initially on December 16, 2009, and again upon reconsideration on June 2, 2010. (R. 79-80, 91-95, 100-03). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Kim S. Nagle (the "ALJ") on April 4, 2011. (R. 40). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Randall L. Harding (the "VE"). Shortly thereafter, on July 20, 2011, the ALJ found that Plaintiff is not disabled because there are a significant number of jobs he can perform in the national economy. (R. 18-31). The Appeals Council denied Plaintiff's request for review on June 28, 2012, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ: (1) erred in giving little weight to the opinions of his treating pain specialist and pain psychologist; and (2) made an improper credibility determination. As discussed below, the Court finds neither of these arguments persuasive. Nevertheless, remand is necessary because the ALJ improperly concluded that Plaintiff has the residual functional capacity for light work even though no physician found him capable of more than sedentary work.

## FACTUAL BACKGROUND

Plaintiff was born on May 12, 1962, and was 49 years old at the time of the ALJ's decision. (R. 165). He has a high school diploma and worked at various times as a material handler, outside delivery person/routing clerk, and sales representative. (R. 47, 65, 202).

**A.     Medical History**

Plaintiff has a long history of back pain dating to a work injury he sustained in 1999.  (R. 184).  He began seeing pain specialist Neeraj Jain, M.D., for his condition in or around February 2004, (R. 375, 1146), and later started treating with pain psychologist Peter R. Brown, Psy.D., in July 2005.  (R. 734). Plaintiff was able to continue working full-time despite his back pain until March 19, 2009.

**1.     2006**

On April 26, 2006, Plaintiff underwent an intrathecal pump insertion due to intractable back pain.    (R. 435-37).    He then received bilateral facet joint injections from L3-L4 to L5-S1 on July 7, 2006.  (R. 430).  The pump failed in August and September 2006, (R. 423, 426), and when Dr. Jain's conservative remedial efforts proved unsuccessful, Anthony DiGianfilippo, M.D., repaired the pump surgically on November 16, 2006.  (R. 444).  Plaintiff's medications at that time included oxycodone, fentanyl and Valium (diazepam).  (*Id.*).

**2.     2007**

On February 26, 2007, Dr. Brown recommended that Dr. Jain prescribe Paxil due to a significant increase in Plaintiff's anxiety "associated with [some unspecified] legal situation."[2]  (R. 378).  The following month, on March 16, 2007, Plaintiff told Dr. DiGianfilippo that he was doing better with the pain pump.  (R. 477).  The pain increased again in late August 2007, however, (R. 469), and on

---

[2]     As a psychologist, Dr. Brown is not licensed to prescribe medication.

September 4, 2007, Plaintiff sought treatment at the Silver Cross Hospital emergency department. (R. 388-91). An X-ray of the lumbar spine showed mild degenerative changes of the disc spaces at L2-L3, and rudimentary (undeveloped) disc at S1-S2. (R. 392). An X-ray of the thoracic spine revealed no definite abnormality. (R. 393). Plaintiff was discharged in good condition with a prescription for Vicodin. (R. 389).

When Plaintiff returned to Dr. DiGianfilippo on October 5, 2007, he was still experiencing "significant back pain" and tenderness at the surgical site, but the doctor did not recommend any treatment changes at that time. (R. 469). CT scans of Plaintiff's lumbar and thoracic spine taken the following month on November 2, 2007 again showed mild degenerative changes, with no evidence of spinal or foraminal stenosis or problems with the pump. (R. 408-09, 411).

### 2.    2008

Throughout 2008, Dr. Jain regularly refilled Plaintiff's pump medications, fentanyl and Bupivacaine. (R. 570, 573, 1105). On March 31, 2008, Plaintiff told Dr. DiGianfilippo that he was not getting good relief from the pump. Dr. DiGianfilippo did not see any obvious problem with the device and suggested Dr. Jain re-inject the medication. (R. 467). Plaintiff did get a pump refill and was doing "remarkably better" during a routine follow-up with Dr. Jain on May 6, 2008. His pain was at a 7 out of 10, his lumbar range of motion was restricted, and he walked in a somewhat flexed position, but his activity level had increased and he was "now working eight hours" a day. He also reported sleeping better and mowing his lawn. (R. 577). At his next routine follow-up with Dr. Jain on July 18,

4

2008, Plaintiff's pain remained a 7 out of 10 and he walked with a somewhat antalgic gait, but his activity level was basically stable and he was not doing any physical therapy. His oral medications included Valium twice a day, 14 OxyContin throughout the day, and up to 5 Roxicodone a day, with no reported side-effects. (R. 575).

Plaintiff was once again essentially stable when he saw Dr. Jain on September 8, 2008, though he was experiencing some pain near the scar in his back at a level of 7 out of 10. Dr. Jain added oxycodone to Plaintiff's medication regimen, prescribing up to 5 per day. (R. 574). The pain increased to an 8 out of 10 at the next routine exam on December 5, 2008, and Plaintiff's activity level had declined due to some tooth extractions necessitated by his long-term use of pain medication. Dr. Jain increased the oxycodone to 7 per day to help with dental pain, increased the fentanyl dosage, and confirmed that Plaintiff was in no apparent distress during the exam. (R. 571).

### 3.    2009

Dr. Jain continued to perform regular refills of Plaintiff's pump medications throughout 2009. (R. 511, 516, 521, 528, 533, 569, 655, 704). On March 19 of that year, Plaintiff stopped working. He had another set of spinal X-rays taken on April 2, 2009 after he fell on the snow. They showed no fracture or subluxation, and only mild spondylosis of L6 on S1. (R. 1119-21). Five days later, on April 7, 2009, Plaintiff had a follow-up visit with Bethany Stork, P.A., a physician assistant working in Dr. Jain's office. Plaintiff reported that his pain was at a 9 out of 10 and his activity level had been limited due to the fall. He walked with an antalgic

5

gait but had full strength, negative straight leg raises and no radicular symptoms. (R. 565, 971). PA Stork referred Plaintiff for a bone scan to ensure that recent weight loss was related only to the tooth extractions. (*Id.*). That April 11, 2009 scan showed no significant abnormalities and only minimal degenerative arthritis. (R. 420).

At his next appointment with Dr. Jain on June 30, 2009, Plaintiff's pain was at an 8 out of 10, his activity level was stable, and he was engaging in a home exercise program. He was able to walk without difficulty or gait disturbance and was in no apparent distress, but he still exhibited limited active range of motion in the lumbar spine. (R. 560). Dr. Jain referred Plaintiff to physical therapy ("PT") three times a week for four weeks. (R. 561). Shortly thereafter, on July 7, 2009, Plaintiff filed his application for disability benefits. When Plaintiff returned to Dr. Jain on August 4, 2009, he described his back pain as "typical" at a level of 7 out of 10. His gait was mildly antalgic and he experienced axial pain with minimal range of motion. (R. 555).

On September 15, 2009, Plaintiff had another routine follow-up with PA Stork. His pain was once again 7 out of 10 and he was pursuing a home exercise program rather than PT. PA Stork noted that Plaintiff's activity level "remained limited secondary to him being out of work," he walked without difficulty or gait disturbance, and his physical exam was unchanged from the previous month. Plaintiff was still taking Valium, Roxicodone and OxyContin, and receiving fentanyl and Bupivacaine in his pump. (R. 551). The following month, on October 13, 2009, PA Stork described Plaintiff's back pain as "fairly

controlled" at an 8 out of 10, with stable activity level. Plaintiff continued to exhibit limited range of motion in the lumbar spine but was walking without difficulty or gait disturbance and was in no apparent distress. PA Stork prescribed Cymbalta to help maximize Plaintiff's sleep, improve his mood and "assist with the naturopathic pain symptoms." (R. 706).

On November 16, 2009, J.B. Goebel, Ph.D., performed a Mental Status Evaluation of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 586-87). Plaintiff told Dr. Goebel that he sleeps for a maximum of two hours at a time, often in a chair or on the floor. (R. 586). He spends his days moving between the couch and the bed trying to get into a comfortable position. On a good day he tries to walk three houses down on his block but he gets depressed because he cannot help much around the house. (R. 587). Dr. Goebel diagnosed Plaintiff with major depressive disorder with chronic pain and insomnia, and assigned him a Global Assessment of Functioning ("GAF") score of 55.[3] Dr. Goebel concluded that Plaintiff is moderately impaired in the ability to "do work-related activities relative to": (1) understanding, memory, sustained concentration and persistence, and (2) social interaction and adaptation. (*Id.*).

Plaintiff returned to Dr. Jain for a routine follow-up the next day, on November 17, 2009. The Cymbalta was helping to make his sleep and mood

---

[3]    A GAF score of 55 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Martinez v. Astrue*, No. 09 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) (internal quotations omitted).

"normal," so Dr. Jain increased the dosage. Plaintiff continued to complain of moderate-to-severe lower back pain, and said he experienced the pain "with most activities of daily living, prolonged sitting, standing, walking, transfer, lifting, or overhead activities." There was no change in his medical history, however, and his gait was normal. (R. 702). Dr. Jain recommended that Plaintiff try facet injections, which he had "long felt" could "help significantly" with the back pain and improve functionality. (R. 703). Plaintiff agreed to this treatment plan and had the injections on December 3, 2009. (R. 666).

Shortly thereafter, on December 12, 2009, Kirk Boyenga, Ph.D., performed a Psychiatric Review Technique of Plaintiff for DDS. (R. 588-600). Dr. Boyenga stated that Plaintiff suffers from major depression secondary to his medical condition, (R. 591), resulting in moderate restriction in activities of daily living; mild difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence or pace. (R. 598). In a Mental Residual Functional Capacity ("RFC") Assessment completed the same day, Dr. Boyenga found Plaintiff moderately limited in his ability to understand, remember and carry out detailed instructions, and to maintain attention and concentration for extended periods. (R. 602). He is also moderately limited in the ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (2) interact appropriately with the general public; and (3) respond appropriately to changes in the work setting. (R. 603). Dr. Boyenga noted that Plaintiff is able to care for personal hygiene,

prepare simple meals, drive a car, make purchases, relate well with family, follow instructions and travel independently. (R. 604). Dr. Boyenga thus concluded that Plaintiff can perform simple, routine, repetitive tasks in a work setting that allows for reduced interpersonal contact. (*Id.*).

Three days later, on December 15, 2009, Francis Vincent, M.D., performed a Physical RFC assessment of Plaintiff for DDS. (R. 606-13). Dr. Vincent found that Plaintiff can occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk for 2 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday. (R. 607). He can occasionally climb ramps/stairs, stoop, and crouch, but never climb ladders/ropes/scaffolds. (R. 608). Dr. Vincent explained that though Plaintiff has significant loss of motion in the lumbar spine, there are no neurological deficits, scans show only mild degenerative changes, and he can ambulate without difficulty or gait disturbance. (R. 607).

Also on December 15, 2009, Plaintiff had a follow-up visit with Dr. Jain. He reported that the Valium was working but the Roxicodone was no longer sufficient for breakthrough pain. On examination, Plaintiff's gait was mildly antalgic, he exhibited "limitations in range of motion," and a straight leg raise produced tightness in the hamstring. (R. 697). Approximately two weeks later, on December 28, 2009, Dr. Jain gave Plaintiff another round of bilateral transforaminal epidural steroid injections at L5-L6 and L6-S1. (R. 695).

When Plaintiff saw PA Stork for a follow-up on December 31, 2009, his pain was at a 9 out of 10 and he complained of stomach pain, nausea, vomiting,

sweating, and headache. PA Stork noted that Plaintiff had experienced similar symptoms when his pump malfunctioned and he started withdrawing from the medication. She increased his OxyContin and switched him to MS Contin as part of a routine opioid rotation. (R. 693). Plaintiff reported significantly limited activity level due to pain and nausea, but he was ambulating without difficulty or gait disturbance and straight leg raise tests were negative bilaterally. (*Id.*). Plaintiff saw Dr. Brown the same day and reported an "acceptable level of pain relief" with no complications from Cymbalta. Dr. Brown noted that Plaintiff was applying for disability benefits "as his level of impairment has made employment unlikely." (R. 741).

**4.    2010**

Plaintiff continued to receive regular pump medication refills throughout 2010. (R. 645, 650, 742, 745, 750, 752, 815, 830, 835, 840). An MRI of his thoracic spine taken on January 4 of that year revealed "[m]idthoracic spondylosis with multilevel mild disc protrusion," but no evidence of spinal cord compression or spinal or neural foraminal stenosis. (R. 288-89). A second MRI taken on January 6, 2010 confirmed no presence of catheter tip granuloma. (R. 620).

On January 12, 2010, Plaintiff had another routine follow-up with PA Stork. His activity level remained limited due to pain and he was not doing any PT or home exercise. PA Stork observed that Plaintiff was in no apparent distress, was able to walk without difficulty or gait disturbance, and had negative straight leg raise tests bilaterally aside from some hamstring tightness. Yet Plaintiff rated his

pain at a level of 9 out of 10. PA Stork decided to switch him back to OxyContin from MS Contin and referred him for a check of his pump. (R. 691).

At his next routine follow-up with PA Stork on March 9, 2010, Plaintiff's pain was down to a 7 out of 10 and he was "doing better" following a pump refill. An increase in his oral medications "helped him with his daily activities," but he was walking with a somewhat antalgic gait. PA Stork noted that Plaintiff had discussed removing the pump in December 2009, but was advised against it. He continued to show limited active range of motion and "significant pain when standing from a seated position or sitting from a standing position." (R. 888). PA Stork then stated that according to a discogram (not found in the record), Plaintiff has "significant pathology in the low back" in the form of "annular tears at L4-L5 and L2-L3 with epidural leaks." (R. 889). She also indicated that he has "progressive lumbar spinal stenosis" and "severe degenerative disc disease," and that he "failed several sessions of physical therapy." (*Id.*). PA Stork further claimed that Plaintiff's physical therapist had "stated at one point that sedentary work is not an option" for him, (*id.*)., but there is no such note in the record.

On April 8, 2010, Plaintiff had his routine follow-up with Christopher Morgan, M.D., of Dr. Jain's practice group. His pain was at an 8 out of 10 but he noticed "some benefit since the OxyContin was increased." Plaintiff was walking without difficulty but still showed limited range of motion, and he reported continued limitation of his activity level. (R. 885). Dr. Morgan saw Plaintiff again on May 6, 2010 for another routine follow-up. His pain was still at 8 out of 10, his

activity level remained limited but stable, and overall his symptoms were "essentially unchanged." (R. 878).

Later that month, on May 24 and 25, 2010, Thomas Low, Ph.D. affirmed Dr. Boyenga's findings from December 12, 2009, and Solfia Saulog, M.D., affirmed Dr. Vincent's findings from December 15, 2009. In their joint report, Dr. Low and Dr. Saulog noted that they considered new evidence of continuing pain management, including the fact that Plaintiff's physical exam on March 9, 2010 showed no signs of depression and was "unremarkable" aside from limited range of motion in the spine and a slightly antalgic gait. (R. 725).

Plaintiff returned to Dr. Morgan for his next routine follow-up on June 3, 2010. His overall pain was "essentially unchanged" at a level 9 out of 10, and his activity level was stable but limited. (R. 875). On July 20, 2010, Plaintiff saw Leah Brown, P.A., another physician assistant with Dr. Jain's practice. He reported that his pain had worsened and was no longer controlled with Roxicodone, but he did experience some improvement following his latest pump refill and corresponding switch to fentanyl. PA Brown instructed Plaintiff to discontinue the Roxicodone and switch to MSIR (morphine). She also recommended additional facet injections. (R. 863).

Five days later, on July 25, 2010, Plaintiff told Dr. Brown that he had stopped taking his full dose of Cymbalta due to some intolerable side-effects. Dr. Brown suggested that Dr. Jain consider switching Plaintiff to Lexapro instead. With respect to Plaintiff's pending social security application, Dr. Brown stated

that he "is endorsing a high degree of disability, combined with high level of opioid therapy," and described his prognosis as "guarded." (R. 739).

Plaintiff went to Silver Cross Hospital on August 9, 2010 complaining of an acute exacerbation of his low back pain. (R. 729-33). He was "in obvious pain," (R. 730), and exhibited decreased range of motion and tenderness. (R. 729). An X-ray of the lumbar spine showed a "[t]ransitional S1 lumbosacral vertebra" but no evidence of acute lumbar spine injury and only mild, stable degenerative disc disease at L2-L3. (R. 733). The doctor gave Plaintiff Dilaudid and Valium, (R. 731), and discharged him the same day in good condition. (R. 732). Two days later, on August 11, 2010, Plaintiff had another round of bilateral facet joint injections at L2-L3, L3-L4, L4-L5 and L5-S1. (R. 858).

On August 17, 2010, Dr. Brown completed a Mental Disorders Report at the request of Plaintiff's attorney. He diagnosed Plaintiff with chronic pain syndrome and indicated that his symptoms are triggered by "[d]ealing with family." (R. 734). Plaintiff's pain level increases with activity, and his depressed mood "limits coping." (*Id.*). The pain and depression also impact Plaintiff's attention and concentration. Dr. Brown identified no side-effects from Plaintiff's medications (once he discontinued Cymbalta) and deemed his prognosis to be "fair." (R. 735). In Dr. Brown's opinion, Plaintiff has marked restrictions in activities of daily living and marked difficulties in maintaining concentration, persistence or pace, and he suffers from anhedonia, sleep disturbance and decreased energy. (R. 736).

The same day, Plaintiff saw PA Brown for a routine follow-up. His pain was 8 out of 10 and he complained that for the previous two weeks, he had been experiencing a "sharp shooting pain down from the left buttock to [the] left knee, which causes his knee to buckle," as well as increased low back spasm and weakness in the left leg. (R. 854). Plaintiff was in no acute distress but said the morphine was not controlling the pain. A straight leg raise test was positive on the left and negative on the right, though both produced low back pain. PA Brown put Plaintiff back on Roxicodone and referred him for an EMG of the legs. (*Id*.).

When Plaintiff saw Dr. Brown on August 23, 2010, he reported that he was no longer taking Cymbalta and had not been prescribed any other medication. His activity level was diminished but stable, his mood was depressed, and he was getting fair pain relief. (R. 737). An August 27, 2010 EMG was normal with no evidence of radiculopathy on the left side. (R. 1110). On September 9, 2010, Dr. Jain performed a caudal epidural adhesiolysis with epidurogram to help relieve Plaintiff's pain. (R. 849). At a follow-up visit on September 21, 2010, Plaintiff reported that the procedure did not provide significant relief and he still had "moderate to severe" pain of 8 out of 10 that was "relieved mildly in the extension position." Plaintiff was able to walk without an antalgic gait, however, and denied any side-effects from his medications. (R. 845).

In November 2010, Plaintiff experienced some negative side-effects when Dr. Jain added Prialt to his pump medications, and asked that it be removed. (R. 825). On December 7, 2010, Plaintiff told Dr. Brown that he had woken up three

days earlier with increased pain but could identify no precipitating incident. He said these occasional flare-ups typically last about five days. Plaintiff continued to complain of a diminished mood, and Dr. Brown suggested that Dr. Jain may want to prescribe Zoloft or Lexapro. (R. 1145).

When Plaintiff followed up with PA Brown on December 13, 2010, he confirmed that the adverse effects from the Prialt had subsided, and the flare-up he reported to Dr. Brown had improved over the past two days with rest, ice and heat. Plaintiff's pain was still 8 out of 10 and he exhibited marked limitation in his lumbar range of motion. He was not, however, in any apparent distress. (R. 819).

### 5. 2011

On February 25, 2011, Dr. Jain completed a Pain Report on Plaintiff at the request of his attorney. He diagnosed Plaintiff with lumbar discogenic pain, lumbar degenerative disc disease, lumbar spinal stenosis, and lumbar post-laminectomy syndrome. Dr. Jain opined that Plaintiff experiences chronic pain in his low back with sitting, standing, walking, lifting, bending and squatting, and described the pain as acute superimposed on chronic "depending on activity." (R. 1146). The pain is relieved by medication, but not completely. In response to a question whether Plaintiff's pain "markedly impact[s] upon the ability to sustain concentration and attention, resulting in frequent failure to complete tasks," Dr. Jain marked the box "Yes." In response to a question whether Plaintiff can "function in a competitive work setting . . . on an eight hour per day, five days per

week basis," Dr. Jain marked the box "No." Dr. Jain also checked a box indicating that Plaintiff's pain will likely increase if he returns to work. (R. 1147).

Plaintiff had an MRI of the lumbar spine on March 7, 2011, which showed "[v]ery mild disc bulging and facet hypertrophy at multiple lumbar levels," but no associated central canal stenosis or neural foraminal narrowing, and no focal disc protrusion or extrusion. (R. 1150-51). The last available record is a March 8, 2011 MRI showing no evidence of abnormality involving Plaintiff's sacrum or coccyx. (R. 1148-49).

### B.    Plaintiff's Testimony

On September 21, 2009, Plaintiff completed a Function Report in connection with his application for disability benefits. (R. 222-29). He said that on the 1 to 3 nights per week when he slept well, he woke up and had coffee while waiting for his medication to kick in. About 45 minutes later, he took a shower, got dressed (including a back brace), and walked for about 5 minutes (half a block). (R. 222). Plaintiff stated that he could prepare sandwiches and microwaveable food, do some minor cleaning and straightening around the house, and mow the front lawn every other week. (R. 224). He was able to drive to the store once a week to pick up "something my wife forgot," but he could not handle the bills because he "forget[s] to write things down in checkbook." (R. 225). Other activities included watching television, talking to his wife and kids, and doing unspecified "activities with kids." (R. 226). Plaintiff estimated that he could lift 10 pounds and walk half a block before needing to rest for 5 to 10 minutes. He reported having trouble lifting, squatting, bending, standing,

reaching, walking, sitting, kneeling, stair climbing, concentrating, completing tasks and following instructions, (R. 227), and he complained that he needed to change positions every 10 to 15 minutes and that his medications made him drowsy. (R. 229).

In a Physical Impairments Questionnaire completed the same day, Plaintiff stated that he could not bend over, do laundry or take out the trash, but he could carry groceries weighing less than 10 pounds. (R. 231). Approximately two times a week, he needed assistance getting out of bed, and he could not sit for more than half an hour before needing to move, stand or walk. He claimed to require "9 rest periods in [an] 8 hour" day. (R. 232).

Plaintiff completed a second Function Report on March 26, 2010, indicating that he is more depressed and has less energy, no appetite, and difficulty sleeping and concentrating. He is no longer able to straighten up around the house, wash dishes, do chores or prepare meals, he is "very forgetful" and gets "agitated easily," and he constantly has to change positions between sitting, standing and lying down. (R. 277, 278). Plaintiff stated that he can still drive to the store once a week to pick up small items, but he is unsure of his judgment due to the medications. (R. 280). He also continues to watch television and spend time with family, though he has a hard time concentrating and needs reminders to go places. (R. 281). Plaintiff thinks he can lift 5 to 10 pounds and walk a quarter of a block before needing to rest for 10 to 15 minutes. He still cannot lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs,

complete tasks, concentrate, or follow instructions, and he now has trouble understanding and getting along with others. (R. 282).

At the April 4, 2011 hearing, Plaintiff testified that he stopped working as a delivery person in March 2009 because he was out a lot due to pain and "couldn't do it anymore." (R. 47, 48). He collected unemployment insurance from March 2009 through 2010 and tried to find work, but his pain medications made it impossible for him to pass drug tests. (R. 49). On a typical day, Plaintiff helps pick up a bit around the house and might watch his granddaughter for short periods of time before showering. (R. 50). He does some of the dishes, then needs to take a break and sit or lie down. He usually finishes the dishes in the afternoon but if he pushes himself too hard, he will "pay the price" and be unable to move. (R. 51). Plaintiff said that he drives about two to four times per week when he has a doctor's appointment or needs to run to the grocery store. He can sit for 15 minutes before "the pain starts kicking in"; stand for 15 to 20 minutes; walk for 10 minutes; and lift 20 pounds for a short time. (R. 52-53). He also spends about 40 percent of the day lying down. (R. 61).

Plaintiff's constant, daily pain encompasses the entire low back and shoots down into the left hip and leg, and even with medication it is at a level 6 out of 10. (R. 53-54). Three to four days a week, he experiences a "flare-up" lasting one to three days, during which period he cannot stay in one spot for too long or get comfortable. (R. 62-63). Exertion makes the pain worse, and it "spike[s] up" if he has to do work. (R. 54, 57). At the time of the hearing, Plaintiff was taking 18 OxyContin tablets a day; 5 Roxicodone tablets a day; 3 Valium

tablets a day; Motrin twice a day; and receiving fentanyl in his pump.  (R. 58-59).

The medicine helps with the pain but also makes him tired and causes

disorientation and memory problems.  (R. 54, 57, 60).  Plaintiff was not taking

any medication for his depression even though he described himself as "very

depressed, where I don't want to even pick up my phone."  (R. 54-55).  Plaintiff

explained that he had stopped taking Cymbalta in July 2010 and had not yet

started a new medication.  (R. 54-55).

**C.     Vocational Expert's Testimony**

Mr. Harding testified at the hearing as a VE.  The ALJ asked him to

consider a hypothetical person of Plaintiff's age, education and past work

experience who can have occasional contact with the public; can perform routine,

repetitive tasks; can follow instructions and travel independently; and engage in

light work with no climbing of ladders, ropes or scaffolds; and only occasionally

climb ramps and stairs, stoop and crouch.  (R. 66-67).  The VE testified that such

a person would not be able to perform any of Plaintiff's past work, but could still

work as a folding machine operator (400 jobs available regionally, 28,000

nationally), collator (600 jobs available regionally, 24,000 nationally) or router

(900 jobs available regionally, 48,000 nationally).  (R. 67-68).  If the person

needed a sit-stand option that would allow him to change positions every 15

minutes, then he could still perform all of the router jobs, but the available folding

machine operator and collator jobs would be reduced by half.  He could also

work as a small products assembler (200 jobs available regionally, 17,000

nationally).  (R. 68-70).  If the person was limited to sedentary work, then he

could work as an addresser.  If he would be off-task for 10 to 15 minutes each hour, however, then he could not perform any jobs.  (R. 72).

**D.    Administrative Law Judge's Decision**

The ALJ found that Plaintiff's back pain, degenerative disc disease and affective disorder are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 20-22).  After reviewing the medical records in detail, the ALJ determined that Plaintiff has the capacity to perform light work involving routine and repetitive tasks, with only occasional climbing of ramps or stairs; occasional stooping and crouching; no climbing of ladders, ropes or scaffolds; and occasional interaction with the public.  Plaintiff needs to alternately sit or stand at will, but this would not cause him to be off-task more than 10 percent of the workday.  (R. 22-23).

In reaching this conclusion, the ALJ gave little to no weight to the opinion of Dr. Jain, explaining that it was inconsistent with Plaintiff's medical tests, which all showed mild degeneration and bulging, with no evidence of stenosis or neural foraminal narrowing.  (R. 25, 28).  The ALJ also found it significant that Dr. Jain's opinion contradicted those of the state agency physicians, and observed that the doctor did not perform a function by function analysis of Plaintiff's abilities.  (R. 28).  For similar reasons, the ALJ gave little to no weight to the opinion of Dr. Brown.  (*Id.*).  The ALJ acknowledged Plaintiff's testimony of severe pain, but noted that the medical tests do not support his complaints.  (R. 26).  In addition, Plaintiff applied for unemployment benefits indicating a willingness and ability to work; he reported being able to do household chores, mow the front lawn, drive,

do some shopping and prepare simple meals; and his demeanor at the hearing did not support his allegations of constant, disabling pain and depression. (R. 26-27).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of light jobs available in the Chicago metropolitan area, including folding machine operator, collator, and small products assembler. (R. 30). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

### A.   Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astru*e, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford*, 633 F. Supp. 2d at 630; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to

perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff claims that the ALJ's decision must be reversed because she: (1) erred in rejecting the opinions of his treating pain specialist and pain psychologist; and (2) made a flawed credibility assessment.

### 1.    Treating Physicians

Plaintiff first argues that the ALJ should have given more weight to the opinions of Dr. Jain and Dr. Brown.  A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); *see Scott v. Astru*e, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astru*e, 627 F.3d 299, 306 (7th Cir. 2010).  An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5) whether the opinion was from a specialist.  20 C.F.R. § 404.1527(c)(2)-(5).  *See, e.g.*, *Simila*, 573 F.3d at 515.

Dr. Jain completed a Pain Report on February 25, 2011 in which he checked boxes stating that:  (1) Plaintiff is unable to function in a competitive

23

work setting for 8 hours a day due to pain; (2) the pain will likely increase if he returns to work; and (3) the pain is not completely relieved by medication and causes a "marked[] impact[] upon [Plaintiff's] ability to sustain concentration and attention, resulting in frequent failure to complete tasks." (R. 1147). In his August 17, 2010 Mental Disorders Report, Dr. Brown checked boxes indicating that Plaintiff has marked restriction in activities of daily living and marked difficulties in maintaining concentration, persistence or pace. (R. 736). Dr. Brown also noted that Plaintiff suffers from anhedonia, sleep disturbance and decreased energy, (*id.*), and that his depression limits his ability to cope with his chronic pain. (R. 734).

### a. Objective Evidence

The ALJ discussed both of these opinions but found them unsupported by the objective medical evidence, which showed only mild to minimal degeneration and moderate impairment in mental functioning. (R. 28). There is ample support for this conclusion.

### 1. Physical

Looking first to Plaintiff's physical condition, his September 2007 X-rays showed mild degenerative changes at L2-L3 and no definite abnormality. (R. 392-93). November 2007 CT scans also showed mild degenerative changes with no evidence of spinal or foraminal stenosis. (R. 408-09, 411). As the ALJ noted, moreover, April 2009 X-rays revealed only mild spondylosis of L6 on S1 (R. 1119-21); an April 2009 bone scan showed no significant abnormalities and only minimal degenerative arthritis (420); January 2010 MRIs showed

24

midthoracic spondylosis with multilevel mild disc protrusion but no evidence of spinal or neural foraminal stenosis, and no catheter tip granuloma (R. 288-89, 620); an August 2010 X-ray revealed mild, stable degenerative disc disease at L2-L3 with no evidence of acute lumbar spine injury (R. 733); an August 2010 EMG was normal with no evidence of radiculopathy (R. 1110); and March 2011 MRIs showed very mild disc bulging and facet hypertrophy at multiple lumbar levels but no central canal stenosis or neural foraminal narrowing, no focal disc protrusion or extrusion, and no abnormality involving Plaintiff's sacrum or coccyx (R. 1148-51). (R. 25).

Plaintiff claims that the ALJ ignored another crucial piece of diagnostic evidence, a discogram showing annular tears at L4-L5 with fluid leakage. (Doc. 12, at 9). According to Plaintiff, on March 9, 2010, Dr. Jain diagnosed him with "progressive lumbar spinal stenosis" and "severe degenerative disc disease." In the same note, Dr. Jain purportedly indicated that Plaintiff had "failed several sessions of physical therapy," and "did not disagree with the physical therapist's statement that 'sedentary work is not an option'" for him. (*Id.*) (citing R. 686, 889).

The problem with this argument is that there is no discogram in the record showing annular tears or fluid leakage. Moreover, it was PA Stork and not Dr. Jain who examined Plaintiff on March 9, 2010 and made the alleged diagnoses. PA Stork is not a physician qualified to make such assessments, particularly where all available tests show that there is absolutely no evidence of stenosis and that Plaintiff's disc degeneration is merely mild, not severe. *See Eggerson v.*

*Astrue*, 581 F. Supp. 2d 961, 966 (N.D. Ill. 2008) ("[P]hysician's assistants are not 'acceptable medical sources' for medical opinions regarding the existence of a determinable impairment."). In addition, there are no PT notes in the record at all, much less ones suggesting that Plaintiff ever "failed" such treatment, or that a physical therapist thought he was incapable of sedentary work. On this record, the ALJ did not err in failing to discuss the nonexistent discogram or the purported diagnoses relating to that test.

The only other objective evidence Plaintiff cites is an August 17, 2010 report from PA Brown noting a positive straight leg raise test on the left. (Doc. 12, at 9; R. 854). The ALJ did not cite this specific piece of evidence but, as noted, she did discuss all of the mild diagnostic test results. (R. 25). She also discussed Plaintiff's gait, observing that he was able to walk without difficulty in September 2009. (*Id.*). Subsequent treatment notes from October 2009, November 2009, January 2010, and April 2010, confirmed this finding. (R. 691, 702, 706, 885). Moreover, Plaintiff was once again ambulating without an antalgic gait in September 2010, just one month after the positive straight leg raise test, and there is no mention of any subsequent straight leg raise tests either that month or thereafter. (R. 819, 845). Plaintiff did present with a mildly antalgic gait on other occasions, including April 2009, (R. 24, 25), but Plaintiff fails to explain how this evidence, along with a single positive straight leg raise test in one leg in August 2010, suffices to undermine all of the mild diagnostic test results, or evidences that he is completely incapable of working. *See McDonald v. Astrue*, 858 F. Supp. 2d 927, 935 (N.D. Ill. 2012) ("[T]he ALJ need

not discuss every piece of evidence in the record" as long as she builds "an accurate and logical bridge from the evidence to her conclusion.") (internal quotations omitted).

## 2. Mental

Turning to Plaintiff's mental condition, the ALJ fairly concluded that he had received only conservative and routine treatment. (R. 26). In February 2007, Dr. Brown recommended that Plaintiff start taking Paxil due to a significant increase in his anxiety. (R. 378). There is no indication in the record, however, that Plaintiff received a prescription for, or ever took this drug. In fact, the only evidence of Plaintiff taking mood-enhancing medicine dates to October 13, 2009, when PA Stork started him on Cymbalta after he suffered a fall. (R. 706). According to a November 17, 2009 treatment note from Dr. Jain, the Cymbalta helped make Plaintiff's mood "normal." (R. 702). When Plaintiff returned to Dr. Brown on December 31, 2009 (nearly two years after his last visit in February 2007), his mood was euthymic (normal), his activities of daily living were stable, and medication side-effects were present but managed. (R. 26, 740).

At a follow-up visit with Dr. Brown on July 25, 2010, Plaintiff reported that he had stopped taking a therapeutic dose of Cymbalta after developing some intolerable side-effects. Plaintiff exhibited a depressed mood and restricted affect at that time. (R. 26, 739). His mood remained depressed in August and December 2010, but no one in Dr. Jain's office prescribed him another antidepressant notwithstanding Dr. Brown's recommendation that he try Lexapro or Zoloft and was a "good candidate" for such medication. (R. 26, 737-38, 1145).

27

At the April 2011 hearing, Plaintiff was still not taking any antidepressants despite claiming to have disabling symptoms. (R. 26, 55).

Plaintiff objects that the ALJ ignored records from Dr. Brown that support his claim of disability. The only example he provides is Dr. Brown's December 2009 observation that Plaintiff remains "a suitable candidate for long-term opioid analgesia" with a "level of impairment [that] has made employment unlikely." (Doc. 12, at 10; R. 740-41). Plaintiff does not explain how Dr. Brown's ongoing decision to clear him for opioid use, which dates back to 2006 when he had the pump implanted, (R. 379), indicates that he lacks the mental capacity to work. Indeed, Plaintiff continued to work for several years after he started receiving opioid injections in the pump. (R. 426, 577). As for Dr. Brown's assertion that employment is "unlikely," this was made in direct connection with a notation that Plaintiff was applying for disability benefits. It is not clear how Dr. Brown reached this unexplained conclusion given that this was the first time he had seen Plaintiff in more than two years. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("The patient's regular treating physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.") (internal quotations omitted). Plaintiff has not provided any basis for challenging the ALJ's reasonable conclusion that the objective treatment notes do not support Dr. Brown's finding of marked limitations.

### b. Additional Factors

As required by the Social Security regulations, the ALJ went beyond the objective tests and provided additional reasons for discounting the opinions of Dr.

28

Jain and Dr. Brown. First, the ALJ accurately observed that both opinions are contradicted by those of the state agency consultants. (R. 28). Dr. Vincent completed a physical RFC assessment, affirmed by Dr. Saulog, opining that Plaintiff is capable of working despite his back condition. (R. 606-16, 725). Dr. Goebel concluded that Plaintiff is moderately (not markedly) impaired in his ability to "do work-related activities relative to" understanding, remembering, sustaining concentration and persistence, adapting, and engaging in social interaction. (R. 587). And Dr. Boyenga completed a mental RFC assessment, affirmed by Dr. Low, stating that Plaintiff has only moderate mental limitations that do not prevent him from working. (R. 602-04, 725).

The Seventh Circuit has made it clear that "if the treating physician's opinion is inconsistent with the consulting physician's opinion . . . the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). Moreover, "[i]t is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)). There is thus no merit to Plaintiff's objection that opinions from Dr. Vincent, Dr. Saulog, Dr. Boyenga and Dr. Low are deserving of less weight because they "never examined the Plaintiff."[4] (Doc. 21, at 2).

Similarly unavailing is Plaintiff's conclusory assertion that the state agency consultants did not "have access to the complete medical file." (*Id.*). Dr. Saulog

---

[4]     Dr. Goebel did examine Plaintiff on November 16, 2009. (R. 586).

and Dr. Low expressly confirmed in their May 24, 2010 report that they "reviewed all of the evidence in the file" at that time, (R. 724), and Plaintiff fails to identify any subsequent record suggesting either that his conditions significantly worsened after that date, or that the doctors' opinions would have changed. *See, e.g., Fohl v. Colvin*, No. 1:12-CV-00766-MJD-RLY, 2013 WL 3366191, at *4 (S.D. Ind. July 5, 2013) (no error where "additional medical evidence was received after the state agency physicians reviewed the medical record, [but the plaintiff did] not point to anything in the new medical evidence to demonstrate that the opinions of the state agency physicians would change."); *Jones v. Astrue*, No. 09 C 0868, 2011 WL 5179592, at *9 (E.D. Wis. Oct. 31, 2011) (ALJ did not err in giving great weight to state agency consultant where the plaintiff "has not contended that her condition significantly worsened after Dr. Muceno's November 2006 review of her records.").

Plaintiff contends that the ALJ failed to consider the fact that Dr. Jain and Dr. Brown are specialists who have been treating Plaintiff for many years and are familiar with his medical history. (Doc. 12, at 10; Doc. 21, at 2). This argument ignores the ALJ's express acknowledgment that Dr. Jain is Plaintiff's "pain specialist physician" and Dr. Brown is his "pain psychologist." (R. 28). The ALJ cited specifically to treatment records from Dr. Jain dating back to 2004, and discussed in detail his subsequent treatment notes from May 2008 forward. (R. 24-25, 28) (citing Exs. 1F, 3F, 4F, 5F, 6F). Though the ALJ only discussed Dr. Brown's treatment notes starting in December 2009, the record reflects that Plaintiff's most recent visit to Dr. Brown prior to that date was on February 26,

2007, more than two years before the alleged disability onset date. (R. 26). On the facts presented, the Court is satisfied that the ALJ properly considered the nature and extent of Plaintiff's relationship with his two pain specialists when she weighed their respective opinions.

Plaintiff finally takes issue with the ALJ's assertion that since Dr. Jain and Dr. Brown failed to perform a function-by-function analysis of Plaintiff's abilities, their opinions have "limited value." (R. 28). Specifically, Plaintiff objects that "the ALJ did not give her own function by function analysis and instead based her opinion off of mild findings on objective testing." (Doc. 12, at 9). This argument is unavailing because the regulations do not require treating physicians or ALJs to provide a function-by-function analysis of a claimant's abilities. *Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009). Of course, it is for this reason that the ALJ should not have relied on the lack of a function-by-function analysis as a factor in discounting the opinions from Dr. Jain and Dr. Brown. Nevertheless, any such error is harmless because the ALJ gave other well-supported reasons for rejecting these opinions, including the lack of any corroborating clinical findings, and the contrary opinions from the state agency consultants. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding an ALJ's error harmless when "it would not affect the outcome of the case.").

Unfortunately, this leads the Court to another, more significant error relating to Plaintiff's RFC. A person who can stand and walk for 2 hours and sit for 6 hours in an 8-hour workday, as set forth by Dr. Vincent, is capable of sedentary work. *See Boycott v. Astrue*, No. 11 C 4162, 2012 WL 1853126, at

*10 (N.D. Ill. May 21, 2012) (citing SSR 83-10, 1983 WL 31251, at *5) (for a sedentary job, "sitting should generally total approximately 6 hours of an 8-hour workday."). Yet the ALJ determined that Plaintiff can perform light work, which requires him to stand and walk for 6 hours in an 8-hour workday. SSR 83-10, 193 WL 31251, at *6; *Brazitis v. Astrue*, No. 11 C 7993, 2013 WL 140893, at *13 (N.D. Ill. Jan. 11, 2013) (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)) ("[L]ight work requires 'much walking or standing (off and on, for a total of approximately six hours of an eight-hour workday).""). Neither party brought this obvious discrepancy to the Court's attention.[5] Given that no physician actually found Plaintiff capable of light work, however, the ALJ must explain this finding.

### 2. Credibility Assessment

To assist the ALJ on remand and help limit the scope of any subsequent requests for review, the Court also addresses Plaintiff's argument that his case must be reversed or remanded because the ALJ improperly discounted his testimony regarding disabling pain and depression. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or

---

[5]       Given Plaintiff's failure to acknowledge, discuss or analyze the one issue that supports a remand, this Court is unlikely to award attorneys' fees if Plaintiff seeks them under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

As a preliminary matter, the Court notes that the ALJ included the following language in her credibility analysis: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [stated] residual functional capacity assessment." (R. 24). The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless boilerplate," but ALJs continue to use it in their decisions. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Each time they do so, plaintiffs and their counsel seize on the language as evidence that the credibility finding is backwards and defective. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis. *Shauger*, 675 F.3d at 696.

Where, as here, however, the ALJ provides a detailed discussion of the plaintiff's symptoms and testimony, and the reasons she did not find the plaintiff's statements fully credible, the use of the boilerplate template does not alone provide a basis for remand. *See, e.g., Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) (the boilerplate language is "inadequate, by itself, to support a credibility finding," but decision affirmed where "the ALJ said more."). Plaintiff's argument to that effect is rejected.

Turning to the ALJ's substantive analysis, she first concluded that the objective medical tests "do not support [Plaintiff's] allegations of constant, disabling pain," (R. 25), or evidence more than moderate mental limitations. (R. 26). The Court has already reviewed the mild diagnostic findings in this case and will not repeat that discussion here, except to note that "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). Plaintiff's assertion that "the record clearly demonstrates deterioration at the time of the alleged onset date and thereafter" appears to be based on the nonexistent discogram and PT report discussed in PA Stork's March 2010 treatment note. (Doc. 21, at 4). That evidence in no way bolsters Plaintiff's credibility in this case.

Contrary to Plaintiff's assertion, the rest of the ALJ's credibility assessment consists of more than mere "conclusory statements." (Doc. 12, at 11). The ALJ first noted that Plaintiff received unemployment benefits for more than 18 months after he stopped working in March 2009. (R. 26). Plaintiff is correct that his attempt to find jobs "does not mean he was able to sustain

competitive employment." (Doc. 12, at 11). Nevertheless, "[i]t is not inappropriate to consider a claimant's unemployment income in a credibility determination." *Miocic v. Astrue*, 890 F. Supp. 2d 1046, 1059 (N.D. Ill. 2012) (citing *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) ("[W]e are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability") (emphasis in original). The ALJ did not discount Plaintiff's testimony solely based on the receipt of unemployment benefits, and the Court is satisfied that she acted reasonably in considering this as one factor in the analysis.

The ALJ next concluded that Plaintiff's demeanor at the hearing did not support his claims of disabling back pain and depression. (R. 27). "An ALJ is allowed to consider physical appearance and demeanor at the administrative hearing as one factor in assessing credibility, [as long as] the ALJ . . . explain[s] how a claimant's testimony or demeanor during the hearing contradicts his claim." *Avery v. Astrue*, No. 11 C 7471, 2012 WL 6692120, at *10 (N.D. Ill. Dec. 19, 2012). Here, the ALJ explained that Plaintiff was able to "participate in the hearing closely and fully without being distracted by his symptoms," and "respond to questions in an appropriate manner." (R. 27). Plaintiff's only response is that he may have taken extra pain medication or had to lie down after the hearing. (Doc. 12, at 12; Doc. 21, at 5). Such speculation is insufficient to demonstrate that the ALJ erred in considering Plaintiff's demeanor at the hearing as part of

her credibility assessment.  *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) ("As one of several factors that contributed to the hearing officer's credibility determination, we cannot say this [consideration of the plaintiff's appearance at the hearing] rendered that judgment 'patently wrong.'").

As additional support for her credibility finding, the ALJ noted that the records do not corroborate Plaintiff's claim that his pain medications cause fatigue, dizziness and disorientation.  (R. 25).  Since Plaintiff does not dispute this finding, any argument in that regard is waived.  *Fleming v. Astrue*, 448 Fed. Appx. 631, 633 (7th Cir. 2011).  The Court notes that the treatment records do show Plaintiff repeatedly denied having lightheadedness, dizziness or weakness from at least July 2008 through December 2010.  (R. 25, 560, 565, 571, 575, 685, 691, 697, 706, 710, 819, 845, 854, 875, 878, 885, 888).  The only exceptions occurred in December 2009, when Plaintiff seemed to be withdrawing from his pump medications, (R. 693), and in November 2010 when Plaintiff was given Prialt (the symptoms disappeared in December 2010 once the Prialt was discontinued).  (R. 819, 825).  Regardless, the ALJ accounted for any alleged dizziness and disorientation in the RFC by limiting Plaintiff's ability to climb.  (R. 25).

The ALJ next observed that the medical records "do not show any significant increase in pain or other symptoms on or near the alleged onset date. Rather, the records show relative consistency in [Plaintiff's] reports of pain and that [he] gets some pain relief from the prescribed medication."  (R. 24).  Plaintiff insists this finding "is not at all supported by the evidence," but all he offers in

rebuttal is the ALJ's failure to discuss: (1) the phantom discogram (*see infra* pp. 25-26); and (2) his receipt of epidural steroid injections on December 31, 2009 which, he says, "would suggest [he] was suffering severe, ongoing pain." (Doc. 21, at 3-4).

There is no dispute that Plaintiff is taking heavy pain medications and has received several epidural injections. However, the ALJ is correct that Plaintiff's treatment plan and complaints of pain have remained largely stable since late 2007. (R. 24). From November 2007 through 2008, prior to the alleged disability onset date, Plaintiff consistently reported his pain at a level of 7 or 8 out of 10. Though this score would ordinarily appear quite high, treatment notes routinely described Plaintiff, who was still working at the time, as being "in no apparent distress." (R. 414, 571, 574, 575, 577). In that regard, a May 6, 2008 note indicated that despite a reported pain level of 7 with restricted range of motion, Plaintiff's activity level had increased and he was "now working eight hours" a day and mowing his lawn. (R. 577). Plaintiff's medications during that period included OxyContin, fentanyl, Bupivacaine, Roxicodone and Valium. (R. 414, 571, 574, 575, 577).

After the March 2009 disability onset date, Plaintiff continued to report that his pain was at a level of 7 or 8 out of 10, with treatment notes reflecting that he was still in no apparent distress and generally walking without difficulty. The pain medications remained essentially the same as well. (R. 551, 555, 560, 706). Plaintiff's pain did increase to a 9 when he fell in April 2009 and when his pump seemed to be malfunctioning in December 2009, but the pain went down to 7

again in March 2010 and thereafter remained between 8 and 9. (R. 565, 693, 819, 845, 854, 875, 885, 888). As discussed earlier, moreover, there was no noticeable change in Plaintiff's objective diagnostic tests from September 2007 through March 2011.

Plaintiff notes that "even persons who *are* disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." *Shauger*, 675 F.3d at 697 (emphasis in original). (*See also* Doc. 21, at 4-5). Perhaps, but the ALJ did not discount Plaintiff's credibility based on the fact that he continued working for some period of time either before or after his alleged disability onset date. Nor does Plaintiff argue in his briefs that he only continued working until March 2009 out of desperation or with the help of a permissive employer. *Cf. Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working."). The ALJ's conclusion that, overall, Plaintiff's pain remained stable both before and after the alleged disability onset date is supported by substantial evidence.

Relying on Plaintiff's September 21, 2009 and March 26, 2010 Function Reports, the ALJ finally observed that his complaints of disabling limitations were inconsistent with his activities of daily living. Specifically, the ALJ noted that Plaintiff "helps with the household chores"; "mows the front lawn"; and "drives, does some shopping and prepares simple meals." (R. 27). Plaintiff responds that according to *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008), "a person who

has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Id.* at 609. (*See also* Doc. 12, at 11). Plaintiff stresses that he has been receiving narcotic medication via the intrathecal pump for many years, and argues that his ability to "complete daily activities on certain days, while at home and medicated by narcotics and/or opioids, does not mean he retained the ability to sustain competitive employment." (Doc. 12, at 11-12).

The Court agrees that a plaintiff's "ability to struggle through activities of daily living does not mean that she can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). *See also Bjornson*, 671 F.3d at 647 (distinguishing activities of daily living and activities in a full-time job). Here, however, the ALJ did not place undue weight on Plaintiff's activities of daily living, but merely considered them as one of several valid reasons for discounting his testimony, as discussed above. *See Schreiber v. Colvin*, 519 Fed. Appx. 951, 961 (7th Cir. 2013). Viewed as a whole, the ALJ's credibility finding is not "patently wrong," and Plaintiff's motion to remand the case on this basis is denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 11) is granted, and Defendant's Motion for Summary Judgment (Doc. 16) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: October 23, 2013

SHEILA FINNEGAN
United States Magistrate Judge